UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JOSEPH E. DUNCAN,

                              Plaintiff,                          **REPORT AND**
                                                                 **RECOMMENDATION**
              -against-                                          CV 10-1164 (SJF)(ARL)


CIGNA LIFE INSURANCE COMPANY OF
NEW YORK,

                              Defendant.
------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

        Before the court, on referral from District Judge Feuerstein, are the parties' cross-motions

for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the

reasons set below, the court recommends that the defendant's motion be granted and the

plaintiff's motion be denied.

                                    **BACKGROUND**

        The plaintiff, Joseph E. Duncan ("Duncan") commenced this action on March 15, 2010,

pursuant to the Employees Retirement Security Act of 1974, 29 U.S.C. §§ 1001, et seq., seeking

to recover long term disability benefits under an employee benefit plan offered by his former

employer, Pfizer, Inc., and issued by the defendant CIGNA Life Insurance Company of New

York ("CLICNY").  Duncan was hired by Pfizer as a packaging technician/maintenance

mechanic on July 23, 2001.  Def. 56.1 Stmt. ¶ 1; Pl. 56.1 Stmt. ¶ 14.[1]  His job was classified as a

--------

[1]The facts set forth in this report are taken from either the uncontested facts set forth in
the defendant's and the plaintiff's Rule 56.1 statements or the Administrative Record ("AR").
The court notes that the plaintiff's Rule 56.1 counter-statement contests most of the facts in the
defendant's Rule 56.1 statement.  However, the court has carefully reviewed the plaintiff's
counter-statement and finds that, for the most part, the counter-statements do not refute the
defendant's contentions.  Rather, the plaintiff's counter-statements essentially supplement the
undisputed facts set forth in the defendant's Rule 56.1 statement with additional facts supporting

heavy duty occupation.  Def. 56.1 Stmt.¶ 2.  Duncan worked at Pfizer until December 12, 2002,

when he injured his knee.[2]  Def. 56.1 Stmt. ¶¶ 10, 11.  Duncan was initially paid disability

benefits from August 19, 2003 to September 15, 2005, for the period beginning December 16,

2002.  Def. 56.1 Stmt. ¶ 12; Pl. 56.1 Stmt. ¶ 17; AR 1431, 1123-25.  After twenty-four months,

the benefits were terminated pursuant to the policy's change in definition from "own occupation"

to "any occupation," but were reinstated retroactively after Duncan appealed.  Def. 56.1 Stmt. ¶¶

12, 25; Pl. 56.1 Ctr. Stmt. ¶¶ 12, 25; AR 822, 858-71,1124, 1431.  CLICNY continued to pay

Duncan long term disability benefits until October 15, 2008, at which point it determined that he

no longer met the definition of disability under the terms of the policy.  Def. 56.1 Stmt. ¶ 82; AR

822, 858, 1124, 1431.

**A.  The Policy**

Under Pfizer's long term disability plan, revised and reissued January 1, 2001, an

employee is considered disabled if:

> 1.  he or she is unable to perform **all of the material duties of his or her regular occupation**; and
>
> 2.  after Monthly Benefits have been payable for 24 months, he or she is unable to perform all the material duties of **any occupation** for which he or she may reasonably become qualified based on education, training or experience.[3]

---

his arguments.

[2]According to the administrative record, Duncun initially suffered from chondromalacia of the right patella.  AR 15.

[3]The summary plan explains that any occupation is "any job for pay in which you are reasonably qualified by training, education or experience."  Pl. 56.1 Stmt. ¶ 12; AR 1676-77. Duncan's "any occupation" date was June 16, 2005.  Pl. 56.1 Stmt. ¶ 26; AR 739.

Def. 56.1 Stmt. ¶ 5; AR 1642 (emphasis added). Once the Benefit Waiting Period has expired,

an employee has three optional disability benefit plans. AR 1643. Optional Plan 2 provides that

an employee is entitled to "[t]he lesser of 60% of an Employee's monthly Covered Earnings

rounded up to the nearer dollar or $25,000, reduced by any other income benefit." Pl. 56.1 Ctr.

Stmt. ¶6; AR 1643, 822. CLICNY contends that the maximum monthly long term disability

benefit was $3,600. Def. 56.1 Stmt. ¶ 6.[4] The maximum monthly benefit is not, however, an

issue because it is uncontested that at the time of his disability, Duncan earned $4,210.71 per

month, *see* AR 7, and thus, was entitled to a gross monthly benefit of $2,526, which was offset

by a social security disability award of $955, for a net monthly benefit of $1,571. Def. 56.1 Stmt.

¶8.

     The policy further states:

> The Insurance Company will pay Disability Benefits if an
> Employee becomes Disabled while covered under this Policy. The
> Employee must satisfy the Benefit Waiting Period and be under the
> care of a Physician. He or she must provide to the Insurance
> Company, at his or her own expense, satisfactory proof of
> Disability before benefits will be paid.

> The Insurance Company will require continued proof of the
> Employee's Disability provided at the Employee's expense, for
> benefits to continue.

Def. 56.1 Stmt. ¶ 9; AR 1651.

     Finally, Pfizer's plan grants the plan administrator authority to determine a claimant's

eligibility for benefits. Specifically, the summary plan description states:

> Benefits under this Plan will be paid only if the Plan Administrator
> of the Claims Administrator decides in its discretion that you are

---

[4]$3,600 appear to be the maximum monthly benefit prior to January 1, 2002. AR 1643.

entitled to them. The Plan Administrator or the Claims Administrator, as applicable, shall make, in its sole discretion, all determinations arising in the administration, construction, or interpretation of the Plan, including the right to construe disputed or doubtful Plan terms and provisions, and any such determination shall be conclusive and binding on all persons, to the maximum extent permitted by law.

Pl. 56.1 Stmt. ¶ 6; AR 1656, 1693.

B. **Duncan's Injuries and Initial Treatment**

On December 17, 2002, five days after his last day of work, Duncan was seen by Dr. Leo Varriale in connection with his right knee complaints. AR 1321. Duncan underwent arthroscopic knee surgery in March 2003, and continued to see Dr. Varriale monthly until May 20, 2003. Pl. 56.1 Stmt. ¶ 31; AR 1298.

On January 30, 2003, Duncan, who was then 35 years old and on disability, had a car accident and sustained injuries to his neck, back, right wrist and left knee. Def. 56. 1 Stmt. ¶ 11; AR 15. Duncan was taken to Brunswick Hospital where he was treated and released and referred for a neurologic evaluation. AR 1442. On February 5, 2003, Duncan was examined by Dr. Rick Singh and complained of neck pain, low back pain, low back pain going down the left extremity and neck pain going down both upper extremities. AR 1442. On February 27, 2003, Duncan had an MRI of his left knee. AR 1454. The radiologist reported his impression as "patellar chondromalacia with lateral patellar tilt and lateral patellar subluxation and narrowing of the lateral patellofemoral joint compartment. Synovial Fluid. Examination, otherwise, unremarkable-limited as above." *Id.*

On March 15, 2003, Duncan had his wrist x-rayed and there was no evidence of a fracture. AR 1450.

**C. The Steps Taken by CLICNY's to Confirm Duncan's Disability Under the "Own Occupation" and "Any Occupation" Definitions**

In or around July 2003, CLICNY sought support for Duncan's benefits claim. Def. 56.1 Stmt. ¶ 13. Duncan's treating physician, Dr. Wiseman, diagnosed Duncan with a knee contusion, herniated disc - L5 spine and obesity. Def. 56. 1 Stmt. ¶ 13; AR 1465. Dr. Wiseman stated that Duncan was in pain and had difficulty performing the activities of daily living but could perform sedentary work. *Id.; see also* AR 1467. Based on the documentation provided, CLICNY concluded that Duncan was disabled under the "own occupation" definition of disability. Def. 56. 1 Stmt. ¶ 14; AR 1431.

As his twenty-four month anniversary grew near, CLICNY undertook a review of Duncan's claim. Def. 56.1 Stmt. ¶16, AR 1123-25. CLICNY scheduled Duncan for two Functional Capacity Evaluations ("FCE"), which Duncan canceled. Def. 56. 1 Stmt. ¶ 17; AR 1124. Duncan stated that he was unable to attend the first FCE because he had a previously scheduled doctor's appointment. Def. 56. 1 Stmt. ¶ 18; AR 1124. Duncan claimed he was unable to travel to the second FCE. *Id.* On May 9, 2005, CLICNY also forwarded a Physical Abilities Assessment ("PAA") to Duncan's treating pain management specialist, Dr. Fandos, and requested copies of his treatment records. Def. 56. 1 Stmt. ¶ 19; Pl. 56. 1 Ctr. Stmt. ¶ 19; AR 859. CLICNY contends that the PAA was never returned, a fact that is contested by Duncan. *Id.;* see AR 859-60. Specifically, Duncan contends that because CLICNY did not provide Dr. Fandos with a fee, Dr. Fandos initially only provided copies of his treatment records. AR 859. Nonetheless, on August 25, 2005, CLICNY notified Duncan that based on the medical records

submitted and its review of his file, he did not meet the definition of disabled under the "any occupation" portion of the policy.  Def. 56.1 Stmt. ¶ 15; AR 1123-25.

CLICNY received Duncan's PAA and records from New York Pain Consultants four days later.  AR 860.  Before Duncan appealed the decision, three CLICNY employees met to discuss the newly submitted PAA and medical records and concluded that Duncan could do sedentary work.  AR 860.

**D.  Duncan's Appeals Following the Initial Termination of Benefits**

Duncan appealed CLICNY's decision on December 11, 2005.  Def. 56.1 Stmt. ¶ 20; AR 886.  In support of his appeal, Duncan submitted, among other things, a letter dated October 5, 2005 from Dr. Fandos, a letter dated November 30, 2005 from Andrew Pasternak, M.A., C.R.C., a copy of his handicapped parking permit, and prescription and medication information.  AR 895, 1023-24.  Dr. Fandos reported that Duncan was totally disabled for an indeterminate period of time.  AR 861.  Mr. Pasternak found, among other things, that the medications Duncan was taking made him sleepy, drowsy and disoriented.  *Id.*  Duncan also contends that his treating physician, Dr. Dowling, prepared a report dated November 1, 2005, which corroborated Dr. Fandos' conclusions.  *Id.*  Dr. Dowling's report is not listed by CLICNY as one of the pieces of information submitted in support of the appeal.  AR 1023.  Duncan also claims to have submitted the cervical, lumbar and knee MRIs, which Duncan argued, unequivocally showed that he had spinal stenosis from foraminal narrowing and herniated discs.[5]

On December 29, 2005, CLICNY's claim's manager, re-opened Duncan's claim for further evaluation in light of the medical evidence submitted. The claim file was then reviewed

---

[5]Duncan also states that his disability was certified by his family doctor, Jerome Greenholz.  who it appears concluded that Duncan was so severely and permanently disabled that he had no use or only limited use of his lower limbs.  AR 862.

by Dr. McCool who, after reviewing the medical evidence, concluded that the medical support for the conclusion that Duncan was unable to work was insufficient. AR 863. Nonetheless, CLICNY requested Mr. Pasternak's test data. *Id.* Mr. Pasternak responded that his test data was set forth in his report and that all the tests he had administered were standard vocational tests. *Id.* Ultimately, CLICNY concluded that Mr. Pasternak had rendered his opinion based on information self-reported by Duncan rather than on specific tests. AR 1025.

On March 6, 2006, an Independent Medical Examination ('IME") was performed by Dr. Lippman. Def. 56.1 Stmt. ¶ 22. Dr. Lippman observed distress caused by pain; bilateral cervical tenderness; positive straight leg raise test bilaterally; abnormal right shoulder, right knee and left knee strength; right calf sensory deficit; right knee reflex loss; antalgic gait; right quadricep atrophy; and use of a cane. Pl. 56.1 Stmt. ¶ 27; AR 1032, 1037-38. Dr. Lippman also found that Duncan had full range of motion in his shoulders, elbows, wrists, hands, hips, knees and ankles. *Id.* Dr. Lippman concluded that Duncan could perform the duties of a full time sedentary occupation. Def. 56. 1 Stmt. ¶ 22; AR 1024, 1041-1042. Dr. Lippman noted that while Duncan could sit for most of the day he would need to change positions every 30 to 45 minutes and might occasionally be restricted from standing or walking, but there was no medical basis for restrictions to his upper extremities that would prevent him from for example typing at a desk.[6] AR 1024, 1042. CLICNY then had a Transferable Skills Analysis ("TSA") performed by Vince Engel who identified six occupations that Duncan could perform based on Lippman's conclusions. Def. 56. 1 Stmt. ¶ 23; AR 1033.

CLICNY affirmed its denial of benefits on March 30, 2006. Def. 56. 1 Stmt. ¶ 20; AR

---

[6]Dr. Lippman's report indicated that MRI results were not available although Duncan contends that he observed Lippman reviewing his reports. AR 864.

13, 127, 801, 886. CLICNY stated in its decision that "while his pain management physician gave less than sedentary restrictions, . . . the office notes of the physical exam findings do not reveal impairments to support these restrictions." Def. 56.1 Stmt. ¶ 21; AR 1024.

On October 18, 2006, Duncan submitted a second appeal. Def. 56. 1 Stmt. ¶ 25; AR 858-871. In support of his second appeal, Duncan provided a report from Dr. Kwan Jakobsen. AR 866, 872-78. Dr. Jakobsen reported that Duncan has a severe disability in relation to his lumbar spine and moderate disability of the cervical and right knee. Referring to the US Department of Labor's Definition of Occupational Titles (DOT) for sedentary work, Dr Jakobsen opined that Duncan could not do sedentary work. Measured against DOT standards, Dr Jakobsen noted that Duncan did not have the ability to sit for six hours total during an 8 hour day and that he was capable of "0 hours" having to shift positions every 5-10 minutes. Additionally Dr Jakobsen concluded that Duncan would be unable to stand or walk for 2 hours during an 8 hour workday. Finally, Dr Jakobsen concluded that Duncan would be unable to lift and carry 10 pounds on an occasional basis because it would irritate his lumbar region. AR 877. Dr. Jakobsen accordingly concluded that Duncan "continued to be totally disabled to work in any type of job. *Id.*

Duncan also provided a report from Dr. Fandos dated August 22, 2006, which provided additional information regarding his qualifications not contained in his October 5, 2005 report. AR 868, 879-80. Based on his review of the MRI results, and Duncan's inability to sit or stand for more than 15 minutes at a time, his reliance on heavy narcotics, and Dr. Fandos own examination, he reiterated that Duncan was totally disabled. AR 880. Duncan also provided CLICNY with a report from Dr. Greenholz, who had previously concluded that Duncan was so severely and permanently disabled that he had no use or only limited use of his lower limbs. AR 862. Dr. Greenholz reiterated his conclusion that Duncan is totally disabled can walk only if

8

aided by a cane, could lift no more than 5 pounds and can not sit for six hours. AR 881. Duncan also submitted a report from Dr. Peter Lesniewski, an orthopedic surgeon, who stated that Duncan's disability prevented him from sitting for more than 4 hours at 20 minute intervals each day. Finally, Dr. Bruce Stein, noted that Duncan has "generalized osteoarthritis as well as herniated discs in his cervical , thoracic, lumbosacral spine" rendering him unable to sit for hours, stand/walk for 2 hours, or lift/carry 10 pounds for up to a third of the day. AR 869-70, 882-85.

CLICNY's peer reviewer, Dr. Plunkett, determined that Duncan had multiple medical problems but thought that Duncan could perform "minor sedentary work activities that would allow him to change positions on a regular basis. AR 846. However, based upon the conflicting medical information, Dr. Plunkett supported Duncan's restriction from sedentary work. Pl. 56.1 Stmt. ¶ 45; AR 845, 102. Accordingly, on February 8, 2007, CLICNY reinstated Duncan's benefits retroactively to September 15, 2005. Def. 56. 10 Stmt. ¶ 25.

### E.  The Investigation, Video Surveillance and Subsequent Termination

On February 5, 2008, as part of its on-going review of benefits eligibility, CLICNY forwarded a Disability Questionnaire to Duncan. Def. 56. 1 Stmt. ¶ 27, AR 782. Duncan timely responded to the questionnaire on March 6, 2008. Def. 56. 1 Stmt. ¶ 29, AR 771-74. Duncan reported that he was out of work because of "back, knee, neck [pain]," that he could drive several miles, that he sometimes used a cane, that he does not regularly walk or volunteer. Def. 56. 1 Stmt. ¶ 30-31, AR 771-74. Believing that some of his responses were inconsistent with the Functional Capacity Evaluation, a conclusion Duncan disputes, CLICNY began to conduct surveillance. Def. 56. 1 Stmt. ¶ 34, AR 708.

Surveillance was conducted on several occasions from April 25 to April 27, 2008, June 6

to June 7, 2008, July 19, 2008, and September 17 to September 20, 2008.  Def. 56. 1 Stmt. ¶¶ 34, 38, 42, AR 601-609, 697-703,  711-716, 725-732.

On the first day of surveillance, April 25th, Duncan was observed exiting his home, without the aid of a cane, and going to his car where he retrieved a case of large water bottles which he carried to his front door. That same day Duncan was followed as he drove from his home in Lindenhurst to the Midtown Tunnel where he was lost in traffic.  Surveillance was re-established at Duncan's home where Duncan returned after at least 3 hours.  Surveillance notes indicate that Duncan walked with a slight limp part of the time.  On April 26th Duncan was observed as he drove approximately 17 minutes from his home to a Walmart store, which he entered.  When Duncan could not be located inside Walmart the surveillance was re-established at his home.  By 5pm the surveillance was discontinued because Duncan had still not returned home.  AR 725-30.

There were no signs of activity at Duncan's home on April 27th and June 6th.  AR 730-32, 711-13.  On June 7th, Duncan was observed walking, without the aid of a cane, from his residence to his car where he removed a case of water bottles from the rear seat and carried it towards his home.  The video reflects that Duncan performed this activity in a fluid manner without any obvious signs of discomfort.  That same day, Duncan was followed as he drove away from his home to a Pep Boys store.  Duncan was observed as he exited the Pep Boys store and was filmed as he engaged in some task in the rear seat of his vehicle.  The video shows Duncan walking, repeatedly bending down over the rear seat of his car, and climbing into the rear seat over a period of approximately 17 minutes.  AR 711-716.

On July 19, 2008, Duncan was observed leaving his house and entering his vehicle "in a fluid manner with no signs of discomfort," removing two fishing rods from the trunk of his car,

driving to the Jehovah's Witness church, driving to a private residence located two minutes from the church, walking up and down the steps of that residence, bending, walking toward a yard sale two house away to give an unidentified female a piece of paper, then driving to and from over ten other residences, participating in what appeared to be ministerial duties, and finally entering a convenience store and a restaurant. At one point Duncan is observed bending to the ground. These activities were carried on from approximately 9:31 a.m. to 3:35p.m. Def. 56.1 Stmt. ¶ 43-47, AR 697-703. A background check also done in July, revealed that Duncan was a "regular volunteer" for the Jehovah's Witnesses. AR 656.

Duncan contends that the report prepared by the surveillance company contains numerous errors and mischaracterizes the videos. Duncan argues that he only carried the water for 12-13 seconds on April 25th and 30 seconds on June 7th before handing it to his wife; that the vehicle he repeatedly bent down in was a Lincoln Navigator, which had a lifting mechanism so that it did not require him to bend as far as he would have in a normal car; that there were times on July 19th that he remained inactive; and that the surveillance report does not reflect Duncan's use of medication, his need to lean on objects or the use of other assistive devices. Pl. 56.1 Ctr. Stmt. ¶35-47. The agent's report did, however, confirm that Duncan was not employed, was not a member of a bowling association, and did not own real estate. Def. 56.1 Stmt. ¶ 52, AR 687-88.

In July 2008, CLICNY requested that Duncan provide a list of his treating physicians. Def. 56.1 Stmt. ¶ 49, AR 691. Prior to sending the letter, CLICNY attempted to contact Drs. O'Halleran and Fandos, doctors listed on an earlier questionnaire. *Id.* CLICNY acknowledges that it already had in its possession Dr. Fandos' records through March 2008, and that Dr. O'Halleran indicated that Duncan was no longer a patient. Def. 56.1 Stmt. ¶ 50, AR 691; Pl.

56.1 Stmt. ¶ 50.  Duncan completed the form and listed Dr. Steven "Littman," Dr. Joseph

Paticoff, Dr. Luis Fandos and Gina Sussi.  Def. 56.1 Stmt. ¶ 55, AR 681.  CLICNY then received

records from Dr. Lippman and Gina Sussi.  Def. 56.1 Stmt. ¶ 56, AR 673-75, 761-69.

On July 31, 2008, CLICNY asked Duncan to complete another Disability Questionnaire.

Def. 56.1 Stmt. ¶ 57, AR 682.  In his response,  Duncan reported that he was out of work due to

"multiple herniations, constant pain, medication often, back and leg problems, morbid obesity,

arm problems, neck problems, and medication dependency."   He also reported that he does not

go for walks, does not regularly shop or volunteer and is only able to drive short distances. AR

664-66.

Another IME was then performed on September 16, 2008 by Dr. David Benatar.  Def.

56.1 Stmt. ¶ 62: AR 626-38.  Despite the fact that Duncan could clearly drive, he had his

attorney, who is also his wife, drive him to the examination.  AR 628.  Duncan arrived for his

exam using a cane although he had not used a cane during any surveillance prior to this date.  AR

633.   Dr. Benatar noted that Duncan had not had cervical or lumbar spine surgery and that it was

unclear whether surgery had been recommended.   Def. 56.1 Stmt. ¶¶ 63, 64, AR 626-628.

During Dr. Benatar's examination, and in contradiction to what the surveillance tapes revealed,

Duncan reported that he is only able to sit for approximately 15-20 minutes, can only walk a

block and a half, that his ability to stand is variable, and that he does not lift anything.  Def. 56.1

Stmt. ¶ 65, AR 627.

With respect to his examination of Duncan, Dr. Benatar noted that the MRI's revealed

multilevel degenerative disc disease at L4-5 and L2-3 with compression at the left L5 and L2

nerve roots.  The cervical MRI revealed disc bulges at C2-3 through C4-5 and T1-2 through T 3-

4 with minimal herniations at C5-6 and C6-7. Dr. Benatar notes that degenerative disc disease is a near normal sign of aging and that approximately 50 percent of people have disc abnormalities on MRI's. Dr. Benatar also reported, among other things, that:

> 1. "there were some inconsistencies during the examination in terms of position of [Duncan's] cervical spine and lumbar spine. He would during the examination, not extend either one to even neutral. During the course of conversation he did extend better than he did during the examination;"
>
> 2. Duncan self-limited his range of motion in his cervical spine and would not allow lateral motion of his right knee because he stated it would cause pain;
>
> 3. Duncan would not lie down during the examination claiming it would cause him pain and that he might not be able to get up; and
>
> 4. There were discrepancies between the range of motion exhibited during the examination and on the surveillance videos; and

AR 633-35. Dr. Benatar concluded that Duncan "should be able to tolerate a sedentary type occupation, stating that sitting and standing should be limited to no more than 45 minutes to one hour continuously although it could be done frequently. Similarly during the work day walking and standing should be done in 10-20 minute intervals but could be done for 2.5 up to 5.5 hours each day. AR 636-37. Finally, Dr. Benatar opined that Duncan could lift up to 20 pounds occasionally and 10 pounds frequently. Duncan disputes these findings contending that Dr. Benatar did not review all of his medical records or MRIs. Pl. 56.1 Stmt. ¶ 52; AR 629-36, 535. CLICNY contends that Dr. Benatar reviewed "all relevant records." Def. Ctr. Stmt. ¶ 52.

Curiously, on September 17th, the day after Duncan was examined by Dr. Benatar, Duncan was observed using a cane for the first time as he slowly walked approximately 45 yards

to his mailbox.  No further activity was observed that day.  AR 601-602.  The next day September

18th,  Duncan walked to his car without a cane, got in and proceeded to drive west on Sunrise

Highway.  Duncan returned home approximately two and a half hours later.  AR 603-605.  On

September 20th, beginning at 9:35 a.m., Duncan was followed as he drove from his home to the

Kingdom Hall Jehovah's Witness Church where for several hours he was followed as he drove to

a number of different private residences, repeatedly entered and exited his vehicle, carried a

briefcase, walked, and stood at length as he talked to area residents.  Duncan was observed

standing and walking "with no sign of discomfort and without the use of a cane."  AR 605-609,

Pl. 56.1 Stmt. ¶ 62; Def. 56.1 Ctr. Stmt. ¶ 62; AR 472-85.  Duncan was lost in traffic at 1:50

p.m., as he pursued these activities.  Surveillance was re-established at his home but was

discontinued at 4 p.m. when he still hadn't returned.  AR 608.

CLICNY then had a new TSA performed, which identified a number of occupations that

Duncan could perform despite his restrictions and limitations.  Def. 56. 1 Stmt. ¶¶ 80, 81; AR

620.  On October 10, 2008, CLICNY notified Duncan that it was discontinuing his benefits.  Def.

56. 1 Stmt. ¶ 82; AR 613-15.  CLICNY indicated in its letter that it had considered his August

2008 disability questionnaire, Dr. Lippman's records from 2007, Dr. Fandos records from 2007

and 2008, Dr. Benatar's report, the surveillance report, and the TSA.  *Id.*  CLICNY noted that the

surveillance had captured significant discrepancies in his reported abilities and limitations versus

his observed activities, for example, Duncan's response in his questionnaire, that he could not go

for walks.

**F.  Duncan's Second Set of Appeals and Termination**

On April 3, 2009, Duncan appealed the October 10, 2008 decision.  Def. 56. 1 Stmt. ¶ 87;

14

AR 525-553.   Duncan submitted additional medical records from Zwanger-Pesiri Radiology, Gina Sussi, N.P., and Bruce Stein, M.D.  AR 540-553.  The MRI done at Zwanger-Persiri on January 8, 2009, reported, among other things, that in the L4-5 region, Duncan had "posterior protruded disc herniation causing mild mass effect on the ventral thecal sac.  A diffuse disc bulge is also present encroaching on the inferior aspects of the right and left neural forarnina.  The herniated disc comes in contact with the left L5 nerve root within the lateral recess."  AR 540. The interpreting radiologist found no significant changes from Duncan's prior MRI.  AR 542. Gina Sussi's report dated July 21, 2008 indicated as part of the subjective findings that there was no change in Duncan's physical exam from his last visit and that he reported chronic low back pain and leg pain - "he has good days and bad days."  AR 541.  Dr. Stein submitted an eltrodiagnostic study on January 20, 2009, which he said revealed "L5-S1 radiculopathy on the right and S1-S2 radiculopathy on the left," but did not opine on his Duncan's ability to do sedentary work.  AR 545.

On April 8, 2009, Duncan's appeal was forwarded to CLICNY's Disability Appeals Team.  Def. 56. 1 Stmt. ¶ 89; AR 523-24.  CLICNY's medical director, Dr. Seiferth, reviewed Duncan's medical records, and it was again concluded that his restrictions and limitations did not prevent sedentary work.  Def. 56. 1 Stmt. ¶ 90; AR 305-06.  Dr. Seifarth noted that surveillance reports and IME found claimant capable of activities greater than sedentary.  AR 306.  CLICNY also noted the fact that "the office note from Gina Sussi . . . did not document loss of muscle tone, bulk or strength, nor does it demonstrate loss of activity to sit or stand."  *Id.*  Finally, while CLICNY acknowledged the EMG report submitted by Duncan, CLICNY stated that Duncan had failed to submit "objective clinical findings to document functional impact." *Id.*  Accordingly,

CLICNY affirmed the decision to terminate Duncan's benefits, noting the discrepancies between his medical records and the surveillance videos, the TSA that set forth suitable positions based on Dr. Benatar's evaluation, and the conclusions reached by its medical director. Def. 56. 1 Stmt. ¶¶ 91-2; AR 197-99.

On December 2, 2009, Duncan filed a second appeal enclosing additional medical records including a report from Dr. Kwan Jakobson dated September 9, 2009, a report from Dr. Bruce Stein dated September 9, 2009, and the MRI reports from August 7, 2009, August 12, 2009 and October 22, 2009. Def. 56. 1 Stmt. ¶ 93; Pl. 56.1 Stmt. ¶ 93, AR 426-51. Dr. Jakobsen found significant quad girth atrophy of the right thigh with a 3 cm difference verses the previous 2.6 difference reported in 2006; significant weakness of the right hip flexion extension and knee extension, loss of right knee ROM, decreased left shoulder flexion extension and chronic pain. Pl. 56.1 Stmt. ¶ 38; AR 428-32. Concluding that Duncan has severe disability in the lumbar region resulting from disc herniation and bulge and moderate disability of the cervical and right knee, accounting for his inability to sit for more than 10 minutes or stand for more than 15 minutes, Dr. Jakobsen concluded that Duncan continued "to be totally disabled unable to work in any type of job." AR 427. The September 8, 2009 report from Dr. Stein also concluded that Duncan remained unable to work indefinitely. AR 435. Dr. Stein based his opinion on his physical exam, recent MRI of the cervical spine and EMG of the upper extremities.

The August 7th lumbar MRI showed degeneration, foraminal narrowing and disc herniation at L1-2, disc herniation and nerve root compression at L2-3, disc desiccation, disc bulge, disc herniation and arthropathy at L3-4, disc herniation causing mass effect on the ventral thecal sac, encroachment, bulging disc and bilateral root contact at L4-5. Pl 56.1 Stmt. ¶ 34; AR

443-44.  The August 12th cervical MRI showed mild straightening of the normal lordotic curve, diminished signal intensity on the intervertebral disc consistent with degenerative change, mild right-sided foraminal narrowing at C3-4, bilateral narrowing at C4-5, disc effacing of the thecal sac, cord impingement, stenosis and bilateral foraminal narrowing at C5-6, bordering canal stenosis and bilateral foraminal narrowing at C5-6 borderline canal stenosis, bilateral foraminal narrowing C6-7, and disc herniation at T1-2.  Pl. 56.1 Stmt. ¶33: AR 446-48.  Finally, the October 22nd right knee MRI showed degeneration of the meniscus and ligament, effusion, subluxation, edema and cartilage loss.  Pl. 56.1 Stmt. ¶ 35; AR 445-51.

On December 23, 2009, Duncan supplemented his appeal with additional records from Dr. Stein.  Def. 56. 1 Stmt. ¶ 94; AR 347-360.  Dr. Stein's records reflected that between August 2009 and December 2009, Duncan continued to have osteoarthrosis, back pain, and knee pain and was referred to an orthopedist for further evaluation of his knee.  *Id.*  Duncan's second appeal was then referred to Steven Lewis ("Lewis").  Def. 56. 1 Stmt. ¶ 95; AR 183.

On December 21, 2009, Lewis telephoned Duncan to explain the guidelines and procedures regarding the appeal, despite the fact that Duncan was represented by counsel.  Def. 56. 1 Stmt. ¶ 96; Pl. 56.1 Ctr. Stmt. ¶96; AR 33.  According to CLICNY, Duncan advised Lewis that he was unsure whether additional documents would be submitted in support of his claim so Duncan requested that the matter be tolled for thirty days.  *Id.*  According to Duncan*,* he advised Lewis that he was on medication so he couldn't understand what he was asking, a fact which is reflected in Lewis' note.  *Id.*  As a result, CLICNY deemed the matter tolled and advised Duncan in writing that it would not count the time between when it requested additional information and when additional information was received toward the mandated appeals time frame.  Def. 56. 1

Stmt. ¶¶ 97, 98; AR 192. CLICNY also advised Duncan that might it require an additional 45 days to render its decision. *Id.* Based on the inclusion of a fourteen day toll, CLICNY determined that its decision was due on March 22, 2010. Def. 56. 1 Stmt. ¶¶ 99, 100; 31.

Duncan contends that he did not agree to toll the claim, and thus, the decision on his appeal was due on March 8, 2010. Pl. 56.1 Stmt ¶¶ 97-100. Duncan states that when he supplemented his appeal on December 23, 2009, he asked to have Lewis explain the purpose of his December 21st phone call. AR 365. In addition, upon receipt of Lewis' December 21st letter, Duncan objected to the tolling period in writing. AR 315.

In either case, Duncan's claim was referred to MLS National Medical Evaluation Services ("MLS"), an independent vendor, for a medical file review. Def. 56. 1 Stmt. ¶ 101; AR 298-301. Dr. Kovach, who was assigned to the claim, was directed to contact any of Duncan's physicians whose conclusions he disagreed with. Pl. 56.1 Stmt. ¶ 70; AR 302. Dr. Kovach reviewed the reports from Jakobsen, Stein, Fandos and all of the 2009 MRIs and concluded that Duncan's claimed restrictions and limitations were not supported by his medical records. Def. 56. 1 Stmt. ¶ 103; AR 233-44. Dr. Kovach reported that Duncan could sit, stand, and walk with a restriction that sitting and standing should be limited to frequent basis of no greater than twenty minutes at a time." *Id.* Dr. Kovach did not try to contact Duncan's doctors until February 9, 2010, five days after he issued the report. Pl. 56.1 Stmt. ¶ 73. CLICNY's medical director, R. Norton Hall, then reviewed the file and concluded that there was no objective evidence to support Duncan's imposed restrictions and limitations. Def. 56. 1 Stmt. ¶106; AR 232. Accordingly, on March 15, 2010, CLICNY sent Duncan a letter affirming the denial of Duncan's appeal Def. 56. 1 Stmt. ¶107; AR 181-183. Duncan commenced this lawsuit on the same day

18

that CLICNY issued its final decision.  Def. 56. 1 Stmt. ¶113.

## G.  The Parties' Contentions

CLICNY asserts that its motion for summary judgment should be granted because its determination was not arbitrary and capricious, but was reasonable and supported by substantial evidence.  *See* Def. Mem. at 17-21.  In particular, CLICNY contends that Duncan's disability questionnaires and medical records were inconsistent, the surveillance videos and Dr. Benatar's report confirmed the plaintiff's functional status, the TSA based on Dr. Benatar's report found that Duncan had the skills and abilities to perform several jobs, and Duncan failed to provide objective evidence to support his claim.

Duncan asserts that summary judgment should be granted in his favor because there is no genuine issue concerning his inability to do sedentary work, and thus, CLICNY's decision was not supported by substantial evidence.  *See* Pl. Mem. at 11-24.   Duncan further asserts that the appropriate standard of review for the court is *de novo.*  Duncan argues, in this regard, that CLICNY was influenced by a conflict of interest because it was both plan administrator and payor of benefits and that his claim is "deemed denied" because  CLICNY failed to render a decision on his claim for benefits within the time frame set forth in 29 C.F.R. 2560.503-1(i)(3)(i).

**DISCUSSION**

## A.      Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In*

*re Blackwood Assocs., L.L.P.*, 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed. R. Civ. P. 56(c) and

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In deciding a summary judgment motion,

the district court must resolve all ambiguities and draw all reasonable inferences in the light most

favorable to the opposing party.  *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150

F.3d 132, 137 (2d Cir. 1998).   If there is evidence in the record as to any material fact from

which an inference could be drawn in favor of the non-movant, summary judgment is

unavailable.  *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996), *cert denied,*

520 US 1228 (1997).

      "Although there is no right to a jury trial in a suit brought to recover ERISA benefits, and

thus the district court [will be] the factfinder at trial, the district court's task on a summary

judgment motion - even in a non-jury case - is to determine whether genuine issues of material

fact exist for trial, not to make findings of fact."  *O'Hara v. Nat'l Union Fire Ins. Co.,* 2011 U.S.

App. LEXIS 7675 *13-14 (2d Cir. 2011)(internal citations omitted)(district court erred when it

weighed competing physicians opinions and made findings based on its own consideration of the

evidence in *de novo* case).  Although, "in some circumstance, it may be appropriate for the

district court to treat a motion for summary judgment as requesting 'essentially a bench trial on

the papers' with the District Court acting as the finder of fact.  In that scenario, . . . it must be

clear that the parties consent to a bench trial [on papers]."  *Id.* (internal citations omitted).  Here,

the parties did not agree to a bench trial on papers, so the undersigned is "obliged to proceed in

traditional summary judgment fashion." *Id.*; *see also Kagan v. Unum Provident,* 2011 U.S. Dist.

LEXIS 40098 *35 (S.D.N.Y. Mar. 31, 2011)(if summary judgment is denied because material

facts are in dispute, a bench trial is then conducted with the court acting as the trier of fact).

**B.      ERISA Standards**

"ERISA permits a person denied benefits under an employee benefit plan to challenge the denial in federal court." *Lopes v. First Unum Life Ins. Co.,* 2011 U.S. Dist LEXIS 34205 * 9 (E.D.N.Y. Mar. 30, 2011)(citing to 29 U.S.C. § 1132 (a)(1)(B)).  The Supreme Court has held that "a denial of benefits under [ERISA] § 1132(a)(1)(B) must be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948 (1989); *see Celardo v. GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003).

Where, as here, a plan confers upon the administrator such discretionary authority, a district court must conduct its review with a strong measure of deference and "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995) (internal quotation marks and citation omitted); *see Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000) (same); *see also Peterson v. Cont'l Cas. Co.*, 282 F.3d 112, 117 (2d Cir. 2002).  Arbitrary and capricious means "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Lopes,* 2011 U.S Dist. at * 9.  Under this deferential standard, a district court's review "is limited to the administrative record." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995).

**C.  Conflict of the Claims Administrator.**

Duncan argues that notwithstanding the fact that the plan confers discretion on the administrator, this matter should be reviewed under a *de novo* standard because CLICNY was influenced by a conflict of interest.  Pl. Mem. in Opp. at 8.  Duncan correctly notes that CLICNY

has a conflict of interest, but incorrectly states that the presence of a conflict alters the standard of review.

"[W]hen applying the deferential standard, courts must take into account any conflict that the plan administrator may have." *Lopes,* 2011 U.S. Dist. LEXIS at *9. "A conflict is present where, [as here], the plan administrator is also the payor of benefits." *Id.* (citing *McCauley v. First Unum Life Ins. Co.,* 551 F.3d 126, 133 (2d Cir. 2008)). But, the presence of a conflict does not change the standard of review, it is simply one of many factors a court should consider. *Id.* The Second Circuit has provided guidelines for the weight to give this factor:

> '[W]here circumstance suggest a higher likelihood that [the conflict] affected the benefits decision, including, but not limited to, cases where an insurance company has a history of biased claims administration,' the conflict of interest
>
> > should prove more important (perhaps of great importance) . . . . It should prove less important (perhaps to a vanishing point) where the administrator has taken steps to reduce potential bias and to promote accuracy, for example by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*McCauley,* 551 F.3d at 133.

Here, Duncan identifies the following conduct and procedural irregularities in support of his contention that the conflict affected CLICNY's decision:

> 1. Lorraine Lubbert's May 2004 request for database and business searches regarding Duncan's former home based construction business and possible surveillance depending on the results, which was deemed premature given that Duncan was covered under the

"own occupation" definition of disability until June 2005.[7] AR
172, 174, 177.

2. Lorraine Lubbert's May 2008 referral of Duncan's claim for
special investigation review in which she lists and mischaracterizes
Duncan's 2005 appeal letter, his 2008 disability questionnaire, his
2006 functional capacity evaluation and his 2007 peer review, as
"red flag/fraud indicators." AR 739.

3. Lorraine Lubbert's involvement in Duncan's case from 2003 to
2009. AR 172, 585, 613-16.

4. The imposition of deadlines for the return of disability
questionnaires that were shorter than the time provided in the plan
for responses. AR 682, 781, 782, 1656.

5. The reference in the surveillance report to Jehovah's Witnesses
being required to volunteer 70 hours per week and 840 hours per
year to hand out the "Beacon." AR 688.[8]

These "procedural irregularities" and "mischaracterizations" are not so irregular as to

suggest a higher likelihood that CLICNY was affected by its conflict in making its benefit

decision. Although Lorraine Lubbert's first request for a special investigation was deemed to be

premature by another CLICNY agent, her second request did set forth Duncan's diagnosis and

acknowledge many of the reasons that Duncan had given for being out of work. The fact that

Lubbert was suspicious of Duncan is not suspect conduct. Moreover, while the record makes

---

[7]Duncan refers to Ms. Lubbert as Ms. Harris with respect to the May 2004 request and
notes the name change gives the appearance of impropriety. However, the document referenced
in connection with the May request refers to Lorraine Lubbert.

[8]In connection with the conflict, Duncan also discusses the conclusions reached by Dr.
Hall, Dr. Benatar, and Dr. Kovach as well as the information gleaned from the surveillance tapes.
While the court may consider CLICNY's review process in determining whether it operated
under a conflict of interest, the issues raised by Duncan with respect to the doctor's conclusions
and the surveillance tapes will be addressed below with respect to whether CLICNY's denial was
arbitrary and capricious.

clear that Lubbert has been a claims manager assigned to Duncan's case since 2004, and did

notify Duncan of his termination of benefits in 2008, there is nothing in the record to suggest that

Lubbert is, in fact, the individual responsible for making the adverse benefit determination.

Similarly, the fact that CLICNY sent Duncan follow-up notices with respect to his questionnaire

is not proof that they were trying to impose a shorter deadline on him. Finally, the typographical

error in the surveillance report, namely, the reference to 70 hours per week rather than 70 hours

per month, or the incorrect reference to the "Beacon," is not the type of conduct that would lead

to the conclusion that CLICNY was affected by its conflict. Accordingly, while the court will

consider the conflict, the court does not believe it to be of "great importance."

### D. Tolling and the "Deemed Denied" Regulation

Duncan further contends that even if the conflict did not affect CLICNY's decision,

Duncan's claim is subject to *de novo* review because CLICNY failed to provide him with a

timely decision on his appeal. The time by which plan administrators must decide initial claims

and appeals is set forth in regulations enacted by the Department of Labor.[9] If a plan

administrator misses the deadline for deciding an appeal, "the claim is deemed denied with

administrative remedies exhausted thereby permitting a claimant to immediately bring an action

in federal court. *See Burke v. PricewaterhouseCoopers LLP Long Term Disability Plan,* 572

F.3d 76 (2d Cir. 2009)(citing *Nichols v. Prudential Ins. Co. of Am.,* 406 F.3d 98, 106-07 (2d Cir.

2005).

---

[9]29 C.F.R. 2560.503-1(i)(3)(i) requires a plan administrator to decide a disability claim within forty-five days with an additional forty-five days if it determines that special circumstances require such an extension. *See Fershadt v. Verizon Communs., Inc.,* 2010 U.S. Dist. LEXIS 13937 * 27-8 (S.D.N.Y. Feb. 9, 2010).

In 2005, the Second Circuit addressed the standard to be applied in "deemed denied" cases in *Nichols v. Prudential Ins. Co. of Am.,* 406 F.3d 98, 106-07 (2d Cir. 2005). The *Nichols* court indicated its agreement with a majority view that, "absent substantial compliance with the deadlines, *de novo* review applies on the grounds that inaction is not a valid exercise of discretion and leaves the court without any decision or application of expertise to which to defer." *Nichols,* 406 F.3d at 109. However, the court never reached the question of whether to adopt "the substantial compliance doctrine," given that the defendant in *Nichols* had failed to comply in any reasonable respect with the deadlines. *Id.* Accordingly, courts have been split on whether arbitrary and capricious review might still be appropriate in deemed denied cases if the plan administrator substantially complies with the deadline. *See Solin v. Sun Life and Health Ins. Co.,* 766 F. Supp. 2d 380, 395 -99 (E.D.N.Y. 2011)(Hurley, J.)(applying substantial compliance analysis); *Fershadt,* 2010 U.S. Dist. LEXIS at * 27-31 (denial of benefits subject to de novo review without substantial compliance analysis);

To further confuse the matter, the regulation relied upon in *Nichols* was superseded in 2002 leaving many courts to question whether the presumption of de novo review was still applicable. *See Fershadt,* 2010 U.S. Dist. LEXIS at * 27-8; *see also Jacobson v. SLM Corp. Welfare Benefit Plan,* 2009 U.S. Dist. LEXIS 78597 *13 (S.D. Ind. Sept. 1, 2009)(commenting that *Nichols* decision relied on an old provision of ERISA). In *Krauss v. Oxford Health Plans, Inc.,* 517 F.3d 614, 624 (2d Cir. 2008), the Second Circuit expressly reserved on the question of whether the *Nichols* presumption of *de novo* review is still applicable under the post-2002 version of the regulation. *Krauss,* 517 F.3d at 624 ("we join our sister circuits in delaying resolution of the question for another day"). Yet, the Second Circuit continues to cite to the

*Nichols* decision. *See Burke v. PricewaterhouseCoopers LLP Long Term Disability Plan,* 572

F.3d 76 (2d Cir. 2009)(citing to *Nichols* for the proposition that "once a deemed denied claim is

in federal court, it is not subject to deferential review, but rather to de novo review.").

Without further clarification from the Second Circuit, the undersigned is guided by recent

decisions in the Eastern District applying the substantial compliance exception. It is undisputed

that CLICNY received Duncan's second appeal on December 7, 2009. AR 13. Duncan argues

that pursuant to the regulations, CLICNY's decision was due on March 8, 2010. Pl. Mem. in

Opp. at 7. CLICNY issued its decision on March 15, 2010 relying on a fourteen day toll.

Although both parties have submitted argument on whether Duncan's conversion with Lewis on

December 21, 2009 tolled the claim, the court need not address the tolling arguments.

CLICNY's decision was, at best, seven days late and was issued on the same day that Duncan

filed his complaint, giving the court a decision to which to defer. Accordingly, the court finds

that CLICNY substantially complied with the regulations and the arbitrary and capricious

standard of review should apply.

**E. CLICNY's Denial of Benefits.**

Both parties agree that Duncan was totally disabled under the "own occupation' definition

of disability for the first twenty-four months of his disability. AR 1431. Although CLICNY

initially determined, in 2005, that Duncan was not disabled under the "any occupation" definition

of disability, after Duncan filed two appeals, CLICNY reversed its decision reinstating Duncan's

benefits retroactively to September 15, 2005. Def. 56. 1 Stmt. ¶ 25. CLICNY did so based on

medical records it had received from Dr. Jakobsen, Dr. Fandos. Dr. Greenholz, Dr. Lesniewski

and Dr. Stein, and several MRI studies. Accordingly, it is undisputed that as of February 8, 2007,

CLICNY had determined that Duncan remained totally disabled. The question for the undersigned, however, is limited to whether there is a genuine dispute concerning CLICNY's determination that Duncan no longer met the any occupation definition of disabled when they terminated Duncan's benefits on October 18, 2008.

CLICNY argues that its determination was rational and based on substantial evidence, and thus, summary judgment in its favor is warranted. In particular, CLICNY emphasizes that the surveillance videos and reports (AR 726-727, 729-730, 711-715) demonstrated that Duncan was clearly able to perform activities beyond those reported on his March 2008 and August 2008 disability questionnaire (AR 664, 772) or reflected in any of his medical records. CLICNY further notes that Dr. Benatar's conclusion that Duncan "should be able to tolerate a sedentary type occupation" was based on his conclusion that Duncan was self-limiting his range of motion during the examination and had exhibited a far greater range of motion on the surveillance tapes and during the course of conversation. AR 626-38. CLICNY further notes that based on the limitations and restrictions set forth in Dr. Benatar's report, CLICNY's Vocational Rehabilitation Counselor then determined that Duncan had the skill and the physical ability to be a "service clerk, repair-order clerk, dispatcher, street department dispatcher, protective signal operator, surveillance-system monitor and service dispatcher." AR 620.

Nonetheless, CLICNY went on to have its medical director review the medical records received from Zwanger-Persiri Radiology, Gina Sussi and Dr. Stein, and still concluded that Duncan's restrictions and limitations did not preclude sedentary work "based on a review of the surveillance videos, Dr. Benatar's examination and the medical records." Def. Mem. at 19; AR 197-198. CLICNY also had an independent review done by Dr. Kovach, who agreed that

Duncan's limitations were not supported by his medical records because Duncan could bend, sit, stand and walk.  AR 244.

Duncan disagrees that CLICNY's conclusion was supported by "sufficient evidence" principally objecting to CLICNY's reliance on the inconsistencies in the disability questionnaire and the surveillance videos.  Duncan argues that CLICNY's statement that the 2008 disability questionnaire contained information inconsistent with his medical records is entirely unsupported given the fact that he had always reported his ability to drive in prior questionnaires.  AR 777. Duncan does not, however, address his August questionnaire in which he reports that he could not take walks, does not regularly volunteer, and is only able to drive short distances which assertions are belied by the surveillance videos.  With respect to the surveillance videos and reports, Duncan argues, among other things, that (1) on April 25th he only held the bottled water for 13 seconds before handing it to his wife; (2) on June 7th he held the bottled water for 30 seconds before handing it to his wife and it was half full; (3) he stayed home on three full days and most of a fourth day during the nine days he was under surveillance, (4) the surveillance report does not reflect the number of times he was forced to stop or lean on railings and other objects for support or shift his briefcase to relieve pain in his hand; (5) he did not bend down to install a part in his car but rather reached under a seat in a Lincoln Navigator installed with a special mechanism that allows it to rise and (6) the report does not reflect that he was inactive for approximately five hours on July 19th, the day characterized in the report as a "full day of activity.  Duncan ignores the obvious inconsistencies between the activity seen on the surveillance videos and his responses to the questionnaires and the complaints he reported to the examining doctors.  Despite Duncan's claims to the contrary, the evidence reflects:

28

1.  Duncan could not only drive long distances but could drive virtually all day long making multiple stops requiring him to enter and exit his vehicle which he readily accomplished;

2.  Duncan could clearly sit for more than 15 minutes at a time without shifting positions;

3.  Duncan could and did walk without a cane and could walk far more then a claimed block and a half and could stand or walk for more than 2 hours in a day;

4.  Duncan demonstrated a repeated ability to lift more than 10 pounds by lifting cases of water and carrying a briefcase around for most of a day despite his claims that he lifts nothing or can't lift more than 5 pounds; and

5.  Duncan can bend repeatedly from the waist and even climb into a rear seat and touch the ground.

All of the above are entirely inconsistent with his doctors conclusions that he remained "totally disabled."

Duncan further argues that the conclusions of Drs. Benatar, Seifarth and Kovach, were influenced by the surveillance reports, and thus, are not credible. Duncan states that Dr. Benatar's conclusion that he could sit, stand, walk and reach frequently, defined as 2.5 to5.5 hrs throughout an eight hour work day, was inconsistent with his findings in the same report that Duncan could only sit or stand for less that forty-five minutes to an hour and walk for 10 to 20 minutes. AR 636, 639. These conclusions are not, however, inconsistent. Duncan also notes that Dr. Benatar acknowledged not having the "benefit of review" of all of the MRI's and finding the ones that he did have to be of poor quality. According to Dr. Benatar's report, Duncan only provided his 2003 MRIs at the exam (AR 632) and, in either case, it is undisputed that all off Duncan's MRIs were later reviewed by Seifarth and Kovach. In consideration of what the MRIs

reflected, each of the doctors recommended no more that what is demonstrated he could do on the surveillance tapes. As such, Dr. Lippman, Dr. Benatar and, his initial treating physician, Dr. Wiseman, all confirmed that Duncan could perform sedentary work.

Duncan also disputes the findings of CLICNY's medical director because he relied on Dr. Benatar's clinical findings when he dismissed the Sussi's report and the report of the 2009 lumbar MRI. AR 232. However, Gina Sussi's report simply indicated that there was no change in Duncan's physical exam from his last visit and that "he has good days and bad days." AR 541. Seifarth correctly noted that she had not documented the inability to sit or stand. AR 306. Finally, Duncan argues that Dr. Kovach's independent peer review is suspect. Duncan contends, in this regard, that, as part of his retainer, Dr. Kovach was advised to contact Duncan's physicians if he disagreed with them. Kovach issued his report on February 4, 2010 (AR 233), but did not attempt to contact Duncan's doctors until February 9, 2010. Dr. Kovach did ultimately reach out for all of Duncan's physicians, and, more importantly, compared all of Duncan's medical documentation with the surveillance videos and determined that the restrictions outlined by Duncan's doctors were not accurate. AR 243.

CLICNY correctly argues that it is not required to defer to the conclusions of Duncan's treating physicians, *see Mood v. Prudential Ins. Co.*, 379 F. Supp. 267, 281 (E.D.N.Y. 2005), and that the court may not substitute its own judgment for that of the plan administrator. *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285-86 (1974). CLICNY gave Duncan a full and fair review of his claim and has presented to this court substantial and "incontrovertible evidence" on which they relied in determining that Duncan can perform sedentary work. In sum, the undersigned finds that no reasonable trier of fact could

determine that CLICNY's denial was arbitrary or capricious and recommends that the

defendant's motion for summary judgment be granted and the plaintiff's motion be denied.

## OBJECTIONS

A copy of this Report and Recommendation is being served by the Court on all parties.

Any objections to this Report and Recommendation must be electronically filed with the Clerk of

the Court within 14 days. Failure to file objections within this period waives the right to appeal

the District Court's Order. *See* 28 U.S.C. §636 (b) (1); Fed. R. Civ. P. 72; *Beverly v. Walker,* 118

F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
      August 5, 2011

                            _____/s/_____
                            Arlene R. Lindsay
                            United States Magistrate Judge